Wilson, J.
(dissenting). A homeless man walks into a check-cashing store. This sounds like the start of a bad joke, but instead is filled with pathos. Charles Smith, with one hand covered by the bottom of his hoodie, demanded money, eventually threatening to shoot the cashier (who was behind bulletproof glass). He challenges his first-degree attempted robbery conviction, on the ground that he did nothing to “[d]isplay[ ] what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm” (Penal Law § 160.15 [4]). His conviction for first-degree attempted robbery resulted in the imposition of a 16-years-to-life prison sentence.[1] That is not what the legislature or Governor intended. As the majority notes, Mr. Smith does not ask us to reconsider or modify any of our prior decisions interpreting Penal Law § 160.15. Instead, he seeks reversal on a ground not controlled by our prior decisions: that an unarmed person who “makes no movements” of his or her concealed hand while threatening the presence of a gun cannot be convicted for attempted robbery in the first degree. Because neither People v Lopez (73 NY2d 214 [1989]) nor any prior precedent compels affirmance, I would not extend our prior missteps by affirming here.
I.
Over the years, our Court has erroneously broadened the scope of the aggravating factor, “[d]isplays what appears to be a . . . firearm,” without regard for the legislature’s actual intent in enacting that language. Neither the legislature nor Governor Rockefeller intended that a defendant, who displayed no object whatsoever during the commission of the crime, could be convicted of attempted robbery in the first degree.
*103 In construing any statute, we must start with its plain meaning and then, if unclear, examine its legislative history (see Riley v County of Broome, 95 NY2d 455, 463-464 [2000]; Patrolmen’s Benevolent Assn, of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976]). Here, the ordinary meaning of “display” is to show or make something evident (see Merriam-Webster Online Dictionary, display [https://www.merriam-webster.com/ dictionary/display] [“to put or spread before the view,” “to make evident,” or “to exhibit ostentatiously”]; see also Oxford English Dictionary, display [https://en.oxforddictionaries.com/definition/ display] [“(to) (p)ut (something) in a prominent place in order that it may readily be seen”]). Stretching “[d]isplay[ ] what appears to be a . . . firearm” to a situation in which nothing is shown or made evident requires some proof that the legislature intended that meaning, because it is unnatural. In Mr. Smith’s case, even if he had possessed a firearm hidden under his hoodie, we would have referred to it as “concealed,” not “displayed.” To reach the conclusion that the legislature meant what, in common parlance, would be the opposite of what it wrote (i.e., “displayed” included “concealed”), we would need legislative history powerfully demonstrating that intent. The legislative history is completely to the contrary.
Prior to 1969, an aggravated robbery charge — armed with a gun — required the People to prove beyond a reasonable doubt that a gun. openly displayed during the crime was loaded and operable (see People v Ahmed, 27 AD2d 729, 729 [1st Dept 1967]; People v Gordon, 19 AD2d 828, 829 [2d Dept 1963]). That task proved to be immensely difficult if the defendant never fired a shot or was not quickly apprehended in possession of (or otherwise tied to) the still-loaded firearm. Accordingly, in 1969, the legislature amended New York’s robbery statute to address that specific evidentiary problem by adding “[displays what appears to be a . . . firearm” as an aggravating factor for both first- and second-degree robbery (Penal Law §§ 160.10 [2] [b]; 160.15 [4]; see L 1969, ch 1012). Thus, “when a participant in the [robbery] exhibits an object appearing to be a firearm, then a presumption — rebuttable, of course— exists that such participant [in the robbery] was armed with a deadly weapon” (Sponsor’s Mem, Bill Jacket, L 1969, ch 1012 at 3, 1969 NY Legis Ann at 39). For first-degree robbery, the amendment also made available an affirmative defense that the firearm displayed was either unloaded or incapable of being fired (see Governor’s Approval Mem, Bill Jacket, L 1969, ch 1012 at 17, 1969 NY Legis Ann at 567).
*104 The justification for the legislation, contained in the bill jacket, stated: “The need for the presumption created by this bill is a practical one” — to help solve the problem involving situations where “proof that the object displayed was, in fact, a loaded weapon, is well-nigh impossible to obtain” (Sponsor’s Mem, Bill Jacket, L 1969, ch 1012 at 3, 1969 NY Legis Ann at 39-40). Likewise, the Governor’s memorandum accompanying the legislation described the bill as one “to increase the penalties for robbery . . . where firearms are displayed” (Governor’s Approval Mem, Bill Jacket, L 1969, ch 1012 at 17, 1969 NY Legis Ann at 567). Governor Rockefeller stated: “Specifically, the bill provides that a firearm displayed during the commission of . . .a robbery is presumed to be loaded and would constitute . . . Robbery in the First Degree” (id. [emphasis added]). He also noted that “[defendants charged with such acts would be permitted to prove, as an affirmative defense, that the firearm exhibited was either unloaded or incapable of being fired” in which case the crime would be reduced to second-degree robbery (id. [emphasis added]). It is important to note, as I discuss later, that neither the legislature nor the Governor provided any indication that the enhancements provided by the legislation were out of any concern for heightened fear by the victim — that rationale was belatedly created by our and other courts.
Additionally, both the New York State Temporary Commission on Revision of the Penal Law and Criminal Code and the Crime Control Council,[2] writing in support of the bill, consistently described the legislation as addressing the evidentiary problem described above (see Letter from NY St Temp Commn *105 on Rev of Penal Law and Crim Code, Apr. 3, 1969, Bill Jacket, L 1969, ch 1012 at 5-6 [“(w)e consider these amendments to be a reasonable and equitable solution to a very serious law enforcement problem” involving the “impossible (task of) proving) that (the defendant) was ‘armed’ when he (or she) committed the crime — even if (the defendant) has a loaded gun in his (or her) possession when apprehended”]; Mem of Chairman of Crime Control Council, Bill Jacket, L 1969, ch 1012 at 9 [“(t)he bill . . . deals with the problem of proof which occurs when a . . . robber displays what appears to be a firearm” but does not discharge the weapon or is not apprehended immediately afterwards so that “the prosecution is generally unable to prove that the defendant was in possession of a ‘deadly weapon,’ an element of robbery (in the) first degree”]).
Likewise, the State Police also described the legislation’s purpose as “neatly do[ing] away with the ancient dilemma concerning loaded vs. unloaded guns” (Mem of NY St Police, Bill Jacket, L 1969, ch 1012 at 11). The Honorable Albert Rosenblatt, then Dutchess County District Attorney and later a Judge of this Court, wrote to explain that the legislation “deals with the operability of a gun (or whether it was loaded) in the context of a robbery situation” (Letter from Albert M. Rosenblatt, District Attorney of Dutchess County, Mar. 21, 1969, Bill Jacket, L 1969, ch 1012 at 15). None of those statements contains any suggestion that any part of the legislative intent was to enhance penalties based on increased fear by the victim.[3]
The difference in the statutory language for first- and second-degree robbery in the 1969 legislation further underscores the legislature’s intent that the display of something that was or looked very much like a real firearm was essential to conviction under either prong of the statute. Both section 160.10 *106 (robbery in the second degree) and 160.15 (robbery in the first degree) contain the exact same operative language: “A person is guilty of robbery in the [first or second] degree when he [or she] forcibly steals property and when . . . [he or she] [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm” (Penal Law §§ 160.10 [2] [b]; 160.15 [4]). However, section 160.15 (first degree) allows the defendant to prove, as “an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged,” in which case the conviction would be reduced to second-degree robbery.
The statutory language makes sense only in the context of the legislative history: that the problem addressed by the statute was the evidentiary difficulty of proving that an actual gun was loaded and operable — not anything having to do with enhanced fear of the victim. Thus, the legislature modified the definition of first-degree robbery to address situations where something that was or looked very much like a real weapon was displayed — not because of the fear that might create, but to address a problem of proof where a real firearm was very likely used. It would follow, then, that prosecutors would charge second-degree robbery where, for example, the defendant was apprehended during commission of the robbery and the firearm was unloaded, or was a toy gun. Without the guidance of the legislative history, the amendment could be interpreted, and has now been by this Court, to allow unarmed persons with a hand in a pocket to be charged with the same crime as a robber who fired shots.
Nevertheless, despite the clear intended purpose of the statute as amended, our Court has, over the years, deviated from the legislative intent without examining it in any detail.
II.
I begin with People v Lockwood (52 NY2d 790 [1980]), which the majority discusses, and whose holding is consistent with the statutory language and legislative intent. Lockwood’s holding does not concern the “[d]isplays what appears to be a . . . firearm” language, but rather the affirmative defense provided by the legislation.
The sole issue raised on appeal to this Court in Lockwood was whether Supreme Court erred in failing to instruct the *107 jury on the affirmative defense contained in section 160.15 (see brief and appendix for defendant-appellant at 2 in People v Lockwood, 52 NY2d 790 [1980], available in New York Court of Appeals Cases and Briefs, vol 398 [1980]). Mr. Lockwood did not raise the issue of whether the use of a toothbrush out of the vision of the victim (thrust into the back of his neck) constituted “[d]isplay[ ] [of] what appears to be a . . . firearm.” In fact, as part of his defense strategy, Mr. Lockwood’s counsel conceded that Mr. Lockwood “had used the toothbrush in a manner intended to make the toothbrush appear to be a pistol” (id. at 16-17). Thus, Lockwood’s holding is just that a defendant who requests and is refused an instruction on the affirmative defense that the “weapon” displayed was really a toothbrush (and hence “incapable of being fired”) is entitled to that instruction. It contains no holding on whether a toothbrush (or concealed hand) sufficiently appears to be a firearm.[4]
Both the majority here and prior decisions of our Court, beginning with People v Baskerville (60 NY2d 374 [1983]), misinterpret Lockwood’s dicta and apply it as if it were a holding. In dicta, we stated: “If, of course, a defendant successfully proves his affirmative defense, he may still be found guilty of robbery in the second degree, which requires only that the defendant forcibly steal property while displaying what appears to be a firearm” (Lockwood, 52 NY2d at 792 n). That dicta referred to “a defendant” generally — not Mr. Lockwood, and even if read to refer specifically to Mr. Lockwood, it arises in a context in which Mr. Lockwood did not argue that his conduct constituted no more than robbery in the third degree: he sought and obtained reversal because of the refusal to charge on his affirmative defense.
*108 Baskerville is where we made our first detour from the legislature’s intent, albeit in dicta. Baskerville’s holding — that a black metal object wrapped in a towel, which the robber raised and pointed at a victim accompanied by a threat to kill her could constitute the “display of what appears to be a firearm” (60 NY2d at 380) — concerns merely the sufficiency of facts showing that the brandished item was something that appeared to be a firearm. However, Baskerville included a rationale never advanced by the legislature, one that later steered our Court astray in Lopez: the idea that the enhancement for first-degree robbery (or attempted robbery) was related to increased fear by the victim. In Baskerville we cited two “apparent justification[s]” for the 1969 legislation: (1) “the difficulty of proving when no shot was fired that what appeared to be a weapon was in fact a weapon” and (2) “the effect upon the victim put in fear of his or her life by the display of what appeared to be a weapon” (60 NY2d at 381). Although we cited authority for the first justification, we cited nothing at all for the second.
Here, the majority points to an observation made in Basker-ville concerning Lockwood — namely, that even if Mr. Lockwood had used a toothbrush to rob his victim, “he could still be guilty of displaying what appears to be a firearm, and would succeed only in reducing his liability from first degree robbery to second degree” (majority op at 96). That observation merely recognized that, because Mr. Lockwood challenged only the failure to give an instruction on his affirmative defense, his success in proving his affirmative defense would have reduced his conviction from first-degree to second. It does not constitute a holding that use of a toothbrush (or other item not remotely resembling a firearm) would be sufficient to establish second-degree robbery.
Baskerville compounded the dicta in Lockwood by adding dicta concerning facts not present in Baskerville and rooted in the fictional legislative concern for enhanced fear. Thus, based on the erroneous conclusion that part of the legislature’s purpose was to punish more severely threats that placed the victim in greater fear for his or her life, and the misreading of the dicta in Lockwood described above, we wrote: “[The] display of anything that appears to be [a firearm], though held inside a coat or otherwise obscured, is covered by sections 160.10 [second-degree robbery] and 160.15 [first-degree robbery]. . . . [T]he true nature of the object displayed is, as concerns *109 criminality, irrelevant” (60 NY2d at 381). Of course, Baskerville did not involve anything concealed under a coat, and offered no support for the proposition that the legislature intended that someone committing a robbery with a toothbrush could be prosecuted for robbery in the first or second degree, however fearful the victim might have been.
Not until Lopez, however, did we reach a holding (rather than dicta) incompatible with the statute: that although “mere statements that a robber is armed with a gun” are insufficient to establish robbery in the first or second degree (73 NY2d at 221), Mr. Lopez’s act of moving his hand inside his vest constituted “[d]isplay[ ] [of] what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm.” In Lopez, we asserted that a “primary purpose [ ]” of the statute “recognizes that the additional fear suffered by a robbery victim confronted by what appears to be a firearm aggravates the nature of the offense and warrants additional punishment” (id. at 219-220), citing only Baskerville, which, as discussed above, cited nothing, and is not what the legislature, Governor, and other bodies responsible for the legislation said at the time.
Indeed, with particular reference to the interpretation of the statutory “display” requirement as reaching the conduct of Mr. Lopez, who displayed no object at all, Lopez expressly relied on the proposition that “the display element focuses on the fearful impression made on the victim” (id. at 220). Based on that fictional legislative intent, we wrote:
“In light of the purpose of the statutory scheme, the broad wording of the display element, and the obligation to construe the Penal Law fairly to carry out the legislative intent [,] . . . ‘the display of anything that appears to be such [i.e., a firearm], though held inside a coat or otherwise obscured’ ... or even a hand consciously concealed in clothing” constitutes first-degree robbery (id., quoting Baskerville, 60 NY2d at 381).[5]
*110 In People v Mendez, decided with Lopez, we either decided that some movement of the apparent weapon was required to meet the display requirement, or did not resolve that issue. In Mendez, the defendant was standing near a stoop where another man was sitting, with “his . . . hand under his shirt” (id. at 219). As the victim passed by, the defendant assaulted him, robbed him of a watch, chain, and $80, and told the man sitting on the stoop “don’t show him the gun” or “[don’t] take out the gun” (id.). The man on the stoop “watch[ed] the robbery with his right hand under his shirt,” after which the defendant and seated man both fled (id.). We held that the defendant’s first-degree robbery conviction had to be reduced to third-degree robbery, because “the man on the stoop did not actively participate in the robbery, nor did he display a weapon or take any action indicating that he had one” (id. at 222). It is unclear whether our holding rested on the lack of evidence that the man on the stoop was involved in the robbery, or that the lack of a movement by the man on the stoop meant that nothing had been “displayed.” Thus, Mendez either has decided that some movement is necessary to meet the “display” requirement (which would require us to reduce Mr. Smith’s conviction to third-degree attempted robbery), or else did not reach that issue, in which case it is now presented by this appeal.
III.
I turn, then, to the record evidence in this case. On the morning of November 1, 2011, Mr. Smith, a homeless 41 year old, entered a check-cashing store in Queens, where Ms. Almeida was working. She was the only employee there, and was separated from Mr. Smith by bulletproof glass. Ms. Almeida, the only witness to Mr. Smith’s conduct, testified that he entered the store, asked for money, stayed approximately 10 minutes, and then said he had a gun. Ms. Almeida pressed a silent alarm; Mr. Smith walked out of the store about five minutes later and was apprehended several minutes later, walking down the street about eight blocks away.
Ms. Almeida’s trial testimony does not establish that Mr. Smith made any sort of movement of his hoodie-covered hand the entire time he was in the store. The prosecutor asked Ms. *111 Almeida a series of questions concerning “what [Mr. Smith was] doing, if anything, with his hands.” She repeatedly described the defendant as “holding” his hand under the bottom of his hoodie, which the trial judge described as “under the shirt at the waist.” She further testified, “I don’t know whether he was holding or not. I was not able to see anything . . . .”
On cross-examination, Ms. Almeida repeated several times her description of the defendant as “holding” his hand under his hoodie “all the time” he was in the store. Defense counsel specifically asked, “Would it be fair to say he reached under his hoodie?” Ms. Almeida decidedly responded, “No. He was like this, like (indicating) . . . .” Defense counsel asked again, “So he lifted his hoodie up?” Ms. Almeida responded, “The hoodie was like this (indicating). . . . Covering his hand.”[6]
The People interpret the record evidence as demonstrating no movement of Mr. Smith’s concealed hand while inside the check-cashing store (see e.g. brief for respondent at 4-6 [“all while holding his hand under his shirt at his waist”; “threats made while he had his hand deliberately and strategically placed under his sweatshirt at his waist”; “he held it under his shirt, at his waist”; “defendant’s own conduct in holding his hand under his shirt at his waistband”]; 12 [“(Ms.) Almeida testified that defendant ‘was holding something’ under his shirt at his waist and she demonstrated for the jury how he held his hand under his hooded sweatshirt”]; 14 [“defendant held his hand in his sweatshirt at the waist”]).
The majority concedes that it is unclear whether Mr. Smith placed his hand under his sweatshirt before or after entering the store. In any event, Ms. Almeida repeatedly stated that Mr. Smith held his hand under his sweatshirt and, when specifically asked if he reached under his hoodie, she responded, “No.” When Mr. Smith was arrested a few minutes after leaving the store, the officers frisked Mr. Smith and found “[n]othing.”
Nothing in the record suggests that Mr. Smith possessed any item whatsoever, let alone an object that appeared to be a *112 firearm. The only witness to the crime testified that she did not see a gun — or, for that matter, anything at all. Accordingly, the evidence is legally insufficient for a jury to reasonably conclude that Mr. Smith displayed what appeared to be a firearm.
It is no answer that Mr. Smith might have been able to avoid a conviction for first-degree attempted robbery by seeking an instruction on the affirmative defense, thereby reducing his conviction to second-degree attempted robbery, for two reasons. First, and most fundamentally, the State bears the burden to prove every element of the offense beyond a reasonable doubt, and “[d]isplay[ing] what appears to be” a firearm is an element of both first- and second-degree robbery. If, as seems clear, the legislature did not intend that the verbal threat of a firearm coupled with a concealed hand would count as “display,” the State has not met its burden. Shifting that burden to a defendant, so that she or he must disprove an element of the offense, is cold comfort. Second, because “display” is an element of both first- and second-degree attempted robbery, absent a display, the proper offense is third-degree attempted robbery, not second.
There may not be much of a principled distinction between someone who moves a hand into his or her pocket while announcing the possession of a firearm and someone whose concealed hand is motionless while he or she claims to have a gun. But there is also no principled distinction between someone who threatens to shoot when his or her hands are visible and not moving towards anything (which cannot constitute first- or second-degree robbery), and someone who moves his or her hand towards a pocket while threatening to shoot (which Lopez erroneously holds is first-degree robbery).
In any event, the legislature clearly intended that neither of those would constitute first-degree robbery. Affirmance here is not compelled by stare decisis, and adherence to the clear intent of the legislature and Governor is more important than pursuing our mistaken course to its end.[7] I therefore respectfully dissent.
*113 Chief Judge DiFiore and Judges Rivera, Stein and Garcia concur; Judge Abdus-Salaam concurs in result in a separate concurring opinion; Judge Wilson dissents in an opinion.
Order affirmed.

. Had Mr. Smith instead been convicted of attempted robbery in the third degree, he would not have been classified as a persistent violent felony offender (see Penal Law §§ 70.02 [1]; 70.08). Attempted third-degree robbery is a class E felony (see Penal Law §§ 110.05, 160.05), for which the maximum sentence “shall not exceed four years” (Penal Law § 70.00 [2] [e]).

. The New York State Temporary Commission on Revision of the Penal Law and Criminal Code (the Bartlett Commission), “an arm of the State Legislature” (People v Petre, 151 Misc 2d 543, 546-547 [Sup Ct, Queens County 1991]), was created in 1961 upon the recommendation of Governor Rockefeller and tasked with “revising] the penal law and determin[ing] the proper role and function of sentencing” (Joshua Logan Pennel, Comment, The End of Indeterminate Sentencing in New York: The Death and Rebirth of Rehabilitation, 58 Buff L Rev 507, 512-513 [2010]). “The legislature gave the Bartlett Commission carte blanche to develop both a penal law and a complimentary sentencing structure” {id. at 513). The Crime Control Council was created in 1967 to combat a “steady increase in crime rate . . . through improved coordination and cooperation of all the state agencies concerned with law enforcement, criminal justice and post-adjudicatory treatment of offenders” (L 1967, ch 167, § 1). It was “made up of the heads of the state departments and agencies concerned with the control of crime” and tasked with the duty of “[a]dvis[ing] and assisting] the governor” in various ways in matters relating to the control of crime {id.).

. The only support for the proposition that the legislation in any way related to increased fear by the victim, if a weapon were displayed, came from the State Administrator of the Judicial Conference of the State of New York, who sent a letter suggesting that the bill would “accomplish two good things” by (1) recognizing “the additional element of fright caused by the perpetrator’s pretended possession of a firearm” and (2) “assisting] in the proof of a case against a defendant who displayed an object during the perpetration of a crime” (Letter from St Administrator of Jud Conf of St of NY, Apr. 10, 1969, Bill Jacket, L 1969, ch 1012 at 12-13). His suggestion has no bearing on the legislature’s or Governor’s intent; moreover, the State Administrator expressly stated that “[t]his bill. . . ha[d] not been considered by the Judicial Conference” (id. at 12).

. Lockwood is precisely the kind of case the legislature meant to reach through the 1969 amendments. After Mr. Lockwood pressed something into the neck and side of his victim, threatening to shoot him, two officers arrived while Mr. Lockwood was rifling through the gas station’s cash register (see brief for respondent at 3 in People v Lockwood, 52 NY2d 790 [1980], available in New York Court of Appeals Cases and Briefs, vol 398 [1980]). An attendant at the gas station testified that he was certain Mr. Lockwood had pressed a gun into the other attendant’s neck; one officer testified that Mr. Lockwood was armed with what appeared to be a “silver handgun”; the other officer testified that Mr. Lockwood was lifting his right hand and pointing a silver or chrome object with a four-inch barrel at him, which appeared to be a handgun (id. at 4). Mr. Lockwood fled in his car and eluded the officers on the scene, but was caught by officers in New Jersey about half an hour later, with no gun in his possession (see id.).

. Lopez was a 4-3 decision. The dissent adopted the same erroneous conclusion, relying solely on Baskerville, that part of the legislature’s intent in enacting the display requirement was “to increase the penalty for putting the victim in fear for his or her life” {Lopez, 73 NY2d at 223 [Titone, J., dissenting]). Consequently, it is not the case that the majority in Lopez considered and rejected the position expressed in my dissent. Rather, the incongruities noted by the dissent provide further evidence that, quite apart *110 from what the legislature and Governor said they meant, they could not have meant to convict an unarmed person of robbery in the first degree.

. Immediately after that, defense counsel asked, “Would it be his right hand or left hand; he put one of his hands under his hoodie,” to which Ms. Almeida responded, “Exactly.” In context, it is not possible to read “he put” as describing motion observed by her; Ms. Almeida had specifically and repeatedly described Mr. Smith as “holding,” and expressly denied that Mr. Smith had reached under or lifted up his hoodie. It is clear the question focused on Ms. Almeida’s inability to remember which hand Mr. Smith had under his hoodie, not whether she observed him putting it anywhere or moving it.

. Because we have deviated quite a way from the legislature’s intent, “the [l]egislature’s competency to correct the misinterpretation is readily at hand” (People v Hobson, 39 NY2d 479, 489 [1976] [internal quotation marks omitted]) to restore its original purpose that demonstrably unarmed robbers are treated differently from those with firearms.